## J. I. CASE THRESHING MACHINE COMPANY, a Corporation, v. W. J. LOOMIS.

(153 N. W. 479.)

**Written contracts — employment agents — soliciting — selling — commission — conversation — independent contract — executed.**

1. Where a written contract of employment of a selling and soliciting agent provides that such agent shall receive a 10 per cent commission on the sales made and accepted under his contract, and further expressly provides that "no commission shall be allowed for sales made where other goods or property is taken in part payment," proof that such agent introduced to his employer a customer who, before such introduction, had told the agent that he would purchase a threshing machine from such employer if it was satisfactory to him, and later went with such agent to the office of the employer, and there said that he would purchase such machine if satisfactory to his son, but would make no definite contract at the time, a conversation also being held at such time in the presence of the employer and of the agent in relation to the taking of a secondhand machine in trade, and the would-be purchaser and the agent returned without making a definite contract, and later the purchaser returned to the office of the principal with his son and approved of the machine, and made a contract with the employer for its purchase on condition that he could turn in a secondhand machine in part payment, which agreement was consummated,—such agent is not entitled to a recovery, upon the written contract, of the 10 per cent commission provided for in said agreement.

**Words — "sell" — "barter" — "dispose of."**

2. The word "sell" is not synonymous with the terms "barter" and "dispose of." It involves a money transaction.

Written contract — subsequent written contract — executed oral contract —
    altered by.
    3. A contract in writing may be altered by a contract in writing, or by an
executed oral agreement, and not otherwise. Comp. Laws 1913, § 5938.

Contract — breaking — threat to break — consideration.
    4. A threat to cause a contract to be broken which another has made is
not a valid consideration for a new contract between the person who makes
the threat and the one who is threatened.

Conditions in contract — waiver — must be pleaded — when relied upon.
    5. A waiver of a material clause of a contract must, in order to be relied
upon, be specially pleaded.


Opinion filed June 4, 1915.    Rehearing denied July 2, 1915.


Appeal from the County Court of Ransom County; *Thomas*, J. Action to recover for merchandise furnished. Counterclaim for commission. Judgment for defendant on counterclaim. Plaintiff appeals.
    Reversed.


Statement of facts by BRUCE, J.

This action was tried to the court, a jury having been waived. It was brought by the plaintiff and appellant threshing machine company to recover from the defendant and respondent the sum of $135.90 for merchandise furnished. The defendant admitted the debt, but set up a counterclaim in the sum of $420 for a commission claimed to have been earned by the defendant in the sale of a threshing machine. Both parties moved for a directed verdict. The trial court granted the motion of the defendant, and from the judgment for the difference between the amount originally sued for and the said counterclaim, namely, $396.31, the plaintiff appeals.


*Lawrence & Murphy,* for appellant.

A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise. Civil Code 1877, § 969; Rev. Codes 1899, § 3936; Annis v. Burnham, 15 N. D. 577, 108 N. W. 549; Cughan v. Larson, 13 N. D. 373, 100 N. W. 1088; Foster v. Furlong, 8 N. D. 282, 78 N. W. 986; Dowagiac Mfg. Co. v. Mahon,

13 N. D. 516, 101 N. W. 903; Houghton Implement Co. v. Doughty, 14 N. D. 331, 104 N. W. 516.

Defendant cannot recover upon quantum meruit. Western Electric Co. v. Baerthel, 127 Iowa, 467, 103 N. W. 475; Apking v. Hoefer, 74 Neb. 325, 104 N. W. 177.

*Charles G. Bangert,* for respondent.

Contracts should be so construed as to arrive at and carry out the intention of the parties. Frost v. Williams, 2 S. D. 457, 50 N. W. 964; Rev. Codes 1905, §§ 5340, 5345, Comp. Laws 1913, §§ 5896, 5901.

They may be explained by reference to the circumstances under which they were made, and the matters to which they relate. Rev. Codes 1905, §§ 5351, 5354, Comp. Laws 1913, §§ 5907, 5910.

In construing a contract the intent is to be gathered not from de-tached parts, but from the whole of it. 9 Cyc. 589; Lindley v. Groff, 37 Minn. 338, 34 N. W. 26; Davis v. Ravenna Creamery Co. 48 Neb. 471, 67 N. W. 436.

If the agreement is not for a compensation, it is necessarily one for a penalty. Lyman v. Babcock, 40 Wis. 503; Sutherland, Damages, 3d ed. § 295; Woods v. J. I. Case Threshing Mach. Co. 155 Iowa, 177, 135 N. W. 399; Davis v. Huber Mfg. Co. 119 Iowa, 56, 93 N. W. 79.

BRUCE, J. (after stating the facts as above). The question before this court is whether the defendant was entitled to a commission of 10 per cent on the sale of the threshing machine in question, and by the terms of his contract of agency. Plaintiff and appellant contends that he is not, as the machine was not sold for cash, but an old thresh-ing machine was taken in part payment thereof, and the contract of agency expressly provides that "no commission shall be paid . . . upon goods sold or exchanged for other goods on account of alleged defects; nor upon sales made where other goods or property is taken in trade or as part payment, unless at the option of the company said dealer accepts such goods or property as his commission, and promises in writing to pay the company at the time of the delivery and settle-ment the amount necessary to make up the net price of the new goods; nor upon any sale not recommended by the dealer in writing upon the company's 1910 order blanks; nor upon any goods sold to purchasers

who seek to purchase at the company's factory, transfer agency, or branch house, unless accompanied by the dealer."

Defendant, on the other hand, claims that such provision, even if applicable to the sale before us, is void as against public policy; and that, seeing that the company's officers completed the sale, the defendant should not be deprived of his commission because they saw fit to take a secondhand engine in part payment. If the evidence had shown in this case, as it does not, that the defendant had furnished a buyer who at the time he was presented to the company was ready and willing to make a cash purchase or the equivalent thereof, but was afterwards permitted by the company to modify such officer or agreement to the extent of turning in a secondhand machine as part of the purchase price, we would have been confronted with a very different proposition than that which is now before us.

Defendant, however, clearly relies and sues upon his contract of agency and for the 10 per cent commission which is allowed thereby, and there is no proof whatever in the record that the purchaser ever at any time agreed with anyone for a cash purchase or for the equivalent thereof; and there is therefore no showing that the defendant was ever at any time, under such contract, entitled to the 10 per cent commission which he sues for.

This contract was a "dealers" contract. It granted to the dealer and "in consideration of the premises" permission "to take orders for its (plaintiff's) machinery, extras, supplies, and repairs." It nowhere, except in the provision hereinbefore referred to, makes any mention of deals for anything but cash or properly secured notes. It expressly provides that machinery shall be delivered "only for cash, or to responsible purchasers who give ample security for all time payments with interest thereon;" that written orders shall be taken for all machinery, "whether for cash or notes, upon the company's 1910 order blanks." It speaks only of orders, and not of sales, as far as machinery is concerned, and these orders are to be sent to the company for acceptance. It provides for a commission of 10 per cent on orders for threshing machines which are accepted; but it further contains the provision that *"no commission shall be allowed for sales made where other goods or property is taken in as part payment unless* at the option of the company said dealer accepts such goods or property as his commission and

promises in writing to pay the company at the time of delivery and settlement the amount necessary to make up the net price of the new goods; nor upon any sale not recommended by the dealer in writing upon the company's 1910 order blanks." Counsel for respondent is not correct in his assumption that the contract provides for a 10 per cent commission unless an option to take the secondhand machinery is given to the agent. It positively states that no such commission shall be allowed unless the option is both given and accepted. It is therefore quite clear that the proof which was adduced did not justify a recovery upon the cause of action which was sued upon, that is to say, under the written contract of agency. Lowe v. Jensen, 22 N. D. 148, 132 N. W. 661; Yancey v. Boyce, 28 N. D. 187, 148 N. W. 539; Egan v. Burnight, — S. D. —, 149 N. W. 176; Huber Mfg. Co. v. Seabold, 14 Ind. App. 109, 42 N. E. 648; Reeves v. Watkins, 28 Ky. L. Rep. 401, 622, 89 S. W. 266.

It is claimed, it is true, that whether a commission shall be allowed in case of a trade is by the terms of the contract left to the option of the company, and that such a provision is harsh and one sided, and therefore void as against public policy. This question, however, we are not called upon to determine. All that is necessary to say is that, even if this clause of the contract had been stricken out, there is nowhere in the contract a provision for any commission on anything but a cash sale or the equivalent thereof.

It is true that there is in the record proof of a conversation with an agent of the company in which an offer was made to allow the defendant the option of accepting the secondhand machine or of guarantying the sale thereof, and that during such conversation the agent told the defendant that unless he accepted such option the deal could not be made; that the defendant told the agent that they (the company) would have his permission to break the deal, and that rather than guarantee the sale of the secondhand machine or accept it himself he would break the deal, would try and stop the deal right there, try and get Oelke to break the contract; that upon receipt of this statement from the defendant the agent informed him that he would take the matter up with Hanson, the branch house manager of the company, which he did, and later came back and said he guessed it would be all right, that Hanson would let the deal go on through without any signing.

There is no evidence, however, that commissions were spoken of during these transactions. In fact, the defendant testifies positively that they were not. Nor is there any evidence of any agreement to waive the provision in the contract which provided that no commission should be received in case of a trade.

On cross-examination the defendant testified:

Q. As I understand the testimony you gave, it was to the effect that Gonlogson asked you to take the old rig they traded in and pay the company the amount they had invested that they would have to have to make up their net?

A. Yes, sir.

Q. That was about the substance of it?

A. Yes, sir.

Q. And you refused to do that?

A. Yes, sir.

Q. What did Gonlogson say then?

A. He claimed that that was the order from the branch house manager, that he had told him to do that and he says, "I don't know as I can vary from that," and I said, "You will have to." And we talked the matter over quite a while, and he says, "I will go and telephone and see what can be done;" and he came out and came back, and of course he wanted me to sign; but I said I wouldn't; and he says, "I guess we will leave it go as it was. Let the deal go on."

Q. There was nothing said then as to what would be done with reference to your commission. He didn't say anything about what commission you were to get?

A. There was never at no time an agreement to take the secondhand rig. Never a time did I agree to take the secondhand rig. I didn't agree to it at all. That was what we argued about.

Q. You wouldn't take the secondhand goods under any consideration as your commission?

A. No, sir.

Q. Either in whole or in part?

A. No. . . . I told him rather than guarantee the sale of a secondhand rig or accept it myself, that rather than do that, I would break up the deal. I would try and stop the deal right there,—try to get Oelke to break his contract.

Q. At that time was there anything said that in the event you didn't do that, whether or not you would get any commission?

A. No, nothing mentioned about commission. Never was mentioned until I asked Mr. Hanson if they wouldn't give me a commission, and he said "No." That was about a year or two after when Oelke paid for the rig.

It is, too, a significant fact that although the contract provided for the issuance of commission certificates in cases of sales which were paid for in notes in whole or in part, as in the case at bar, and which certificates were to be redeemed in cash when the purchase price was finally paid, no such certificates appear to have been issued to the defendant, nor does there seem to have ever been any demand therefor. In fact, no demand seems to have been made for any commission at all until at least a year after the balance of the purchase price had been paid. Even then there is no demand for a commission, but merely the question, "if they would not give me a commission." The evidence, therefore, falls far short of proving any agreement for the 10 per cent commission provided for by the contract, and it is on the contract that the action is brought.

The only theory, indeed, on which the judgment can be sustained is that the company waived the provision relating to the acceptance of or guaranty of the sale of the secondhand machine and that if this were waived there is an agreement in the contract independently thereof for a 10 per cent commission. The two clauses, however, must be taken together, and where is there in the contract any agreement for commissions in cases of trades? The principal clause provides that "for each traction, portable or skid engine . . . sold, duly settled for, and delivered, . . . a commission of 10 per cent." The word "sell" is not synonymous with the terms "barter" and "dispose of." It involves a money transaction. Mora v. Murphy, 83 Cal. 12, 23 Pac. 63; Re Carr, 16 R. I. 645, 27 Am. St. Rep. 773, 19 Atl. 145, 146; Phelps v. Harris, 101 U. S. 370, 381, 25 L. ed. 855, 859; Consumers' Brewing Co. v. Norfolk, 101 Va. 171, 43 S. E. 336; 7 Adjudged Words & Phrases, 1st ed. 6407, 6408.

In addition to this we find that in the first clause of the contract the

31 N. D.—3.

dealer agrees to deliver machinery only for cash or to responsible purchasers who will give ample security for all time payments.

Even if the agent Gonlogson had authority to waive the provision which provides that commissions shall not be paid in cases of trades unless the sale of the article taken on such trade shall be guaranteed, and of this there is much doubt, still a new agreement for the payment of the 10 per cent commission or of any commission at all was necessary, as nowhere is there to be found in the contract any agreement to pay commissions except on cash sales or their equivalent. Plaintiff expressly claims that he is suing on the written contract and on the written contract alone, and there is no evidence of the reasonable value of the services claimed to have been rendered. Even, therefore, if there was a waiver of the option clause, such waiver in no way resurrected an agreement to pay a 10 per cent commission in cases of trades, for no such agreement is to be found in the contract.

We, too, find neither in the law nor in the contract itself any authority for any such new agreement or waiver. The contract expressly provides that no acceptance of an order "or the approval of any general agent, officer, or salesman of the company shall be deemed a waiver of any breach of duty or any stipulations of this agreement unless expressly so agreed by the company in writing."

Section 5382, Rev. Codes 1905, being § 5938, Comp. Laws 1913, provides that "a contract in writing may be altered by a contract in writing or by an executed oral agreement, and not otherwise." There is no such additional contract in writing in the case at bar, or at any rate no such contract is sued upon, nor do we find any proof of an execution of the alleged oral agreement, nor do we believe that there was any consideration therefor. The threat to cause a contract to be broken which the plaintiff was himself a party to, as he admits that on the visit to Fargo the taking of a secondhand machine was spoken of and discussed, can hardly be held to amount to a consideration. Not only is all of this true, but no such waiver is pleaded or relied upon, and the only theory on which plaintiff in fact relied or could rely upon under the pleadings was the theory that the clause as to secondhand machines was void as against public policy. He nowhere in his pleadings pleaded a waiver of the clause in question, and it is elementary that a plaintiff cannot show a waiver of performance or a modification

of any part of a contract without alleging it, and that the fact showing a waiver of a provision in a contract must be specially pleaded. 9 Cyc. 727.

We are not unmindful of the cases of Davis v. Huber Mfg. Co. 119 Iowa, 56, 93 N. W. 78; Woods v. J. I. Case Threshing Mach. Co. 155 Iowa, 177, 135 N. W. 399; and McGeehan v. Gaar, S. & Co. 122 Wis. 630, 100 N. W. 1072, in which commissions seem to have been allowed and on which the defendant places much reliance. In the case of Woods v. J. I. Case Threshing Mach. Co. however, there was no positive negation of the commission provided for in the case of a trade such as is to be found in the contract before us, while the holding in the case of Davis v. Huber Mfg. Co. is expressly repudiated by the sole and only authority upon which it is based, viz., § 966 of the 1st edition of Mechem on Agency, and in which the author says:

"These principles have been most frequently applied in the case of brokers employed to sell real estate, and a consideration of their application here will throw light upon the whole subject. A broker employed to sell real estate may be authorized and required by the terms of his undertaking not only to find the purchaser, but to procure from him a valid written agreement binding him to purchase upon the terms specified, and where this is his undertaking, unless the principal waives this condition by accepting the purchaser and selling to him, or otherwise, the broker has not earned his commissions until it is performed; but the authority and duty of the real estate broker, as ordinarily employed, do not go so far. As so employed, he has no implied authority to bind his principal by a written contract to sell the real estate, and, unless he contracts for more, it is no part of his implied duty to complete a binding contract with the purchaser. His duty is performed when he has found a purchaser who is ready, willing, and able to purchase *upon the terms specified,* or, if no particular terms were agreed upon, when he has produced a purchaser to whom the principal sells."

Here, in the case at bar, *the terms specified were cash or notes, and there was an express provision waiving the commission in case of a trade.* The case as a whole, indeed, comes within the general rule of the same author, which is to be found in §§ 1513 and 1514 of his second edition, and in which he says: "Section 1513. Agree-

ment to pay compensation—Express—Implied.—It is entirely competent for the parties to agree expressly not only that the agent shall be compensated for his services, but that his compensation shall be a certain sum, or shall be paid in a certain way, or shall be ascertained in a particular manner. It is also competent for them to agree that *he shall be compensated only in a certain event, or that he shall receive no compensation at all.* Section 1514. Express Agreement Conclusive.—*Wherever the parties have expressly agreed upon the fact that compensation shall or shall not be paid, or shall be paid only in a certain event, that agreement,* in the absence of fraud or mistake of fact, *is conclusive.* If the principal has expressly agreed to pay a compensation, the fact that the service was, through no fault of the agent, of no value to him furnishes no excuse for not paying. So if the agent has *expressly agreed to serve without compensation, he will have no claim for wages however beneficial his services may, have proved to the principal. And so if compensation is to be paid only in a certain event, or upon the happening of a given contingency, no claim can arise except upon the happening of the event or contingency agreed upon."*

When we examine also the case of McGeehan v. Gaar, S. & Co. supra, we find no provision which expressly negatives the allowance of a commission in cases of trades. In that case the court merely held that the plaintiff was entitled to the commissions which were provided for by the contract, and no more. It, in short, expressly upheld the terms of the contract, which provided: "If the agent takes anything in trade it is understood that he takes it on his own account, and the amount allowed for it comes out of his commission. If the amount allowed is more than his commission, he is to make up the deficiency;" and the whole recovery was based upon this provision. The sale or trade, like the one at bar, was one which the plaintiff himself had originally negotiated, but it was ultimately made and consummated by other agents of the company. "I think," the court said, "that the facts bring the case within the provision that the plaintiff is entitled to such commissions *as the contract contemplates."*

The judgment of the county court is reversed, with directions to enter judgment for the plaintiff for the amount sued for.

Goss, J., dissenting.   My views are not in accord with the majority. This is not because of the law announced, but rather because, as I view it, the main contention of the respondent is ignored entirely, and few, if any, of the facts supporting it stated.   Loomis held a dealer's contract with the company wherein, as stated in the majority opinion, it was at the option of the company in the first instance, provided a sale was made under the contract, as to whether it would allow defendant a commission on the sale.   But because this dealer's contract was in existence, it does not necessarily follow that the sale in all respects was made under it.   Its provisions could be waived or modified according as the company and the dealer saw fit to agree with reference to the particular deal.   And the main question on this appeal is not as to the law governing the parties if the sale was made strictly under the terms of the dealer's contract.   It is elementary that, if such were the case, the contract would govern.   But, instead, do the facts show a sale made with a waiver of the provision of the contract that the dealer should take his commission out of secondhand rigs taken in by the company on the deal, and that, instead, the dealer should be paid a commission as on a sale for cash or on time, disregarding the secondhand machinery taken in part payment?   Manifestly the company contracts with reference to its own rights; and with no limitations on it concerning the sale of its own property, could make any agreement with Loomis in this respect that it saw fit.   The facts surrounding the sale and the waiver, if any, will be stated.

Loomis procured the purchaser, one Oelke, since deceased.   He had conditionally promised Loomis that he would purchase a threshing rig of or through him.   Later in carrying out this agreement the two left Enderlin, their local town, for Fargo, where Loomis introduced Oelke to Hanson, plaintiff's Fargo agent, and all of them examined plaintiff's threshing machinery; but Oelke would not purchase a rig without his son, an engineer, also examining it.   So the parties returned to Enderlin, Oelke to return to Fargo with his son that the latter might two days later also pass judgment on the rig.   Oelke told Loomis that it was unnecessary for the latter to go with them to Fargo, because if the son was satisfied, as was he, with the machine, they would buy it.   The son was suited with it and they agreed to purchase a $4,200 rig.   Then or later the purchaser executed a note for $3,000 due that

fall, and the company agreed to take in his old threshing outfit at $1,200 as the balance of purchase price. The sale was not made independent of Loomis, but through him and one Gonlogson, whom Loomis introduced to the Oelkes and who was the plaintiff's sales agent, and who made two inspection trips to pass upon the value of the secondhand rig before the acceptance of it and closing of the purchase deal. On one of these trips and before the delivery of the machine (and whether before or after the signing of the order for the machine by Oelke the evidence does not disclose, but in any event before the deal was finally closed), Gonlogson presented to Loomis for the latter's signature a written guaranty that Loomis would sell the secondhand rig, and evidently, as assumed in the main opinion, either accept the same as his commissions, or guarantee its resale at $1,200, pursuant to the provisions of ¶ E. of the dealer's contract reading as set forth in the main opinion. To this point beyond question the parties had operated under the dealer's agreement, although the strict terms thereof had not been complied with because the order had not been taken by the dealer, but instead by the Fargo office or its agent Gonlogson, and to that extent at least it is undisputed the dealer's contract had been deviated from, although no contention of a release from dealer's commissions is made on this score as the same would be clearly untenable. Now, as to the further facts: Loomis testifies that, when he was asked to give that guaranty, he replied that the company's expert had put a price on the rig and he himself had never seen it, and as to guarantying it, "I wouldn't think of it for a minute. Well, he insisted that I would have to sign or the deal would have to be broke, and I says, 'You have my permission to break the deal because I won't do it. I will break the deal before I will sign that thing.' I says, 'Rather than do that I will break the deal;' and he insisted that I should sign in that way, and then he says, 'I will go in and see Hanson, and see if he will let the deal go through that way;' and he went and telephoned and come back, and said he guessed it would be all right, Hanson would let the deal go through without my signing. 'Well,' I says, 'I will not sign it, I refuse to sign it.' I says, 'You passed judgment on the rig, and I don't know anything about secondhand threshing rigs. You were up there and saw it, and you can accept it yourself, or the company can accept it and do what they please with it.' . . . I told

him rather than guarantee the sale of a secondhand rig or accept it myself, that rather than do that I would break up the deal; that I would try and stop the deal right there, try and get Oelke to break the contract. . . . Nothing was said about commissions." The machine had not yet been delivered or settled for. No other demands were ever made on him, and the company took the secondhand rig to Fargo and closed the deal. Two years passed. Oelke paid his note. Loomis claimed a commission on the sale, and the plaintiff refused to recognize his right to any commission.

This testimony is wholly uncontroverted. Plaintiff has proceeded on the theory that the sale was necessarily made under the dealer's contract, without any deviation therefrom; that when Loomis refused to guarantee that $1,200 would be forthcoming to plaintiff for the secondhand machinery taken by it, it was immediately exonerated from all liability for commissions under the contract. But it would seem that the question of waiver by the company of insistence upon this particular provision of the dealer's contract also is involved. Did it waive its right to stand on that contract provision under the facts? It is undisputed that the dealer breached the dealer's contract, and had the parties stopped right there and had nothing more been said or done between the company's agents and Loomis, no claim for commissions could have been made. But at this stage of the proceedings it must not be overlooked that the purchaser had not fully consummated the deal and that he was the dealer's purchaser and more or less in his control. This is important under the threat then made by the dealer that he would cause Oelke to throw up the purchase entirely. The influence of the dealer was necessary unless the company would take chances on the threat being carried out. That this was wholly beside the contract and a violation of the dealer's agreement, matters not. Did the parties with this situation before them settle their difficulty by an understanding had with the company through Hanson that, as Loomis says, the deal could go through as it was, that is, without any guaranty, but with the understanding that Loomis would be entitled to commissions? Can it be said that this is fairly open as an issue of fact to be passed upon? It would seem to be so and that the trial court's finding to that effect has substantial foundation in the evidence. Recognizing the force of this the plaintiff disputes the authority of

Gonlogson or Hansen to alter the dealer's contract. It is true that the contract contains the usual stipulations virtually divesting every agent of the company from acting for the company, but such provisions have been dealt with and disregarded by this court and others heretofore. See Westby v. J. I. Case Threshing Mach. Co. 21 N. D. 575–588, 132 N. W. 137; Advance Thresher Co. v. Vinckel, 84 Neb. 429, 121 N. W. 431; Reeves & Co. v. Younglove, 148 Iowa, 699, 127 N. W. 1017; Koester v. Northwestern Port Huron Co. 24 S. D. 546, 124 N. W. 740; First Nat. Bank v. Dutcher, 128 Iowa, 413, 1 L.R.A. (N.S.) 142, 104 N. W. 497; Nichols & S. Co. v. Paulson, 6 N. D. 400, 71 N. W. 136; and if this was the deal made and the company received the benefit of the sale under it, even though the act of the agent in making the sale was beyond the agent's authority, the reception of the benefits and their retention by the plaintiff is a ratification of the sale, *as made,* and precludes it from disclaiming the burdens arising under the sale, which burdens it must take with the benefits. Westby v. J. I. Case Threshing Mach. Co. 21 N. D. 575–588, 132 N. W. 137; Colean Mfg. Co. v. Blanchett, 16 N. D. 341, 113 N. W. 614. The facts show that the company has received $3,000 of the purchase price in cash, and the balance in the secondhand machinery at its own appraisal as to value, all under the deal made with Oelke through the assistance of its dealer, Loomis. The machine is paid for. It made the sale and took the payment under circumstances from which it can be reasonably inferred, inasmuch as it never denied liability for commissions until long afterwards, that it would pay defendant his dealer's commission. When the company should have spoken and informed Loomis that it would not pay the commission if he persisted in refusing to give the guaranty, it not only kept silent but informed him "that the deal could go through" as it was, knowing at the time his understanding was he should have his usual dealers sale commission of 10 per cent, to earn which he had procured said purchaser.

A word as to the majority opinion. It states that Gonlogson, after phoning Hansen, "later came back and said he guessed it would be all right; that Hansen would let the deal go on through without any signing. There is no evidence, however, that commissions were spoken of during these transactions. In fact, the defendant testifies posi-

tively that they were not." Commissions were not *spoken of,* but the majority ignore and overlook the crucial fact that the company's act in presenting the blank guaranty to the dealer for signature was for the only possible purpose of having him elect in what he should take his commissions. Surely the company would not have taken his guaranty and claimed that no commissions were owing because they were not then "spoken of." Commissions were in the minds of the parties throughout the deal: when Oelke was procured as a purchaser by Loomis; when Gonlogson was utilizing Loomis to close the sale, and in doing so presented the guaranty blank to Loomis that he should guarantee payment of $1,200 worth of machinery or buy it at that figure. That they were not "spoken of" matters not. Guaranties are not asked under such circumstances merely as accommodations. Under the holding and ideas of the majority such is all Loomis's acts amounted to —but an accommodation to assist defendant to sell its machinery. "Actions sometimes speak louder than words," they did so here, and concerning commissions not "spoken of" orally.

To quote again from the majority opinion: "It is, too, a significant fact that although the contract provided for the issuance of commission certificates in cases of sales which were paid for in notes in whole or in part, as in the case at bar, and which certificates were to be redeemed in cash when the purchase price was finally paid, no such certificates appear to have been issued to the defendant, nor does there seem to have ever been any demand therefor," and more along the same line of reasoning. This would be proper addressed to a jury, as it is an argument *on facts.* It has no place in the opinion to justify a holding that the evidence presents no disputed question of fact of waiver for a jury's consideration. It seems to me that this is a usurpation of the province of the jury.

Because no commissions were "spoken of," and no commission certificates issued, might well be found by a jury to be no sufficient reason for a conclusion of fact that commissions were not earned, when considered with a finding for which there is evidence, that the guaranty was intentionally waived when Gonlogson, after talking with Hansen, in charge of the sale, told Loomis, Oelke's friend, in whom Oelke had confidence, and after Loomis's threat to break the deal, that it *"would be all right. Hansen would let the deal go through without any sign-*

*ing."* This intentionally chloroformed Loomis and enabled it to secure the sale with resulting profits. A jury only can determine the fact of whether Loomis was thus misled into believing a waiver of contract provisions was intended, and that he should have his commissions accordingly. Believe the judgment should be affirmed.

BURKE, J. dissenting. Being unable to agree with the majority, and believing the matter of especial importance, I will set forth my views in a separate dissent. Loomis was the local agent of the plaintiff, and as such signed the regular selling contract. This contract is in evidence, and consists of three parts: First, those things which the company agrees to do; second, those things which the agent agrees to do; and a third part, supplemental and explaining the first and second subdivisions. Under the first subdivision we find: "And the company in consideration of the premises, and for the due observation of this agreement, upon the part of said dealer, agrees: (a) To allow the following commissions to the said dealer, which will be in full for all charges, services, expenditures, etc., . . . for each traction, portable, or skid engine, . . . separator, trucks, straw stacker, feeder and band cutter, . . . water tank, engine tender, . . . sold, duly settled for and delivered within the proper territory, by or through the agency of the said dealer, and not otherwise, a commission of ten per cent." Under the third subdivision, which in a nature explains and modifies the first and second subdivisions, appears this paragraph: "(e) That no commission shall be paid . . . upon sales made where other goods or property is taken in trade or as part payment, unless *at the option of the company,* said dealer accepts such goods or property as his commission, and promises in writing to pay the company, at time of delivery and settlement, the amount necessary to make up the net price of the new goods." The entire controversy in this case is over the construction of the words which we have italicised, *"at the option of the company."* The threshing machine company claims that those words mean that the company has the option of paying or not paying the agent if any secondhand machinery is taken in in part payment. Loomis, on the other hand, insists that the company has the option of paying the commission *in cash or secondhand goods.*

The majority opinion adopts the threshing machine company's version of the contract, and it is from this portion of their opinion that I wish to register a vigorous dissent.

The case at bar is typical of at least half of the threshing machine sales made in this country. There is no dispute that Loomis furnished a buyer satisfactory to the company, who sold him a new rig for $4,200, taking in payment short term notes, since paid, and which were practically cash, for $3,000, and also a secondhand rig upon which they placed a valuation of $1,200. Loomis was not consulted about the valuation of this secondhand rig and had not even examined it. The company sent its representative to Loomis, pending the sale, and exercised its option and required Loomis to accept his commission out of the secondhand machinery. This Loomis refused to do, because, as he said, he had not examined said secondhand machinery and did not know its value. Thereupon the representative of the company, after telephoning to the general manager, notified Loomis that the sale could go through without him having to take his commission in this manner. Loomis insists that this entire transaction amounted to a waiver of the company's option to require him to accept secondhand machinery as his commission and that he is, therefore, entitled to cash. As already stated, this court holds that when any secondhand machinery is taken in upon a sale the agent is entitled to no commission unless the company gives it to him as a "tip." It is with this construction of the contract that I take issue. It is safe to say that one half of the threshing machine business of this country, amounting to many millions of dollars annually, consists of sales in which part of the consideration is secondhand goods. I do not know who will be the most surprised, the threshing machine companies or their thousands of agents, to learn that the agents have not earned commissions on those sales. Such a construction seems to me so unreasonable and so unnatural, that it should be unnecessary to produce further argument or authority to refute it. Every dictate of reason and common sense points to the construction contended for by Loomis, to wit, that the company had the *option to pay cash or require him to take his commission from the secondhand rig.* In fact, the company recognized this construction when it sent out its agent to exercise such option and demand that Loomis take his commission from his secondhand property, other-

wise the visit of Gonlogson was an idle ceremony and a useless expense. An examination of the authorities shows only three cases at all similar to ours: Davis v. Huber Mfg. Co. 119 Iowa, 56, 93 N. W. 78; Woods v. J. I. Case Threshing Mach. Co. 155 Iowa, 177, 135 N. W. 399; McGeehan v. Gaar, S. & Co. 122 Wis. 630, 100 N. W. 1072. While those cases are not exactly in point, they clearly show that the construction of the contract adopted by the majority opinion is utterly untenable. In all three of these cases, the court held that in the absence of some action upon the part of the threshing machine company requiring the agent to take his commission from the secondhand machinery, that said commission was payable in cash. In the case of Woods v. J. I. Case Threshing Mach. Co. supra, the Iowa supreme court quotes enough of their contract to show that it is the identical contract which existed between the parties to this suit, such quotations as are given being word for word, comma for comma, identical with the contract before us. The Iowa court says: "Plaintiffs [the selling agents] had nothing to do with the secondhand engine as to either transaction in which it figured. Their commission was due when they furnished a purchaser who was satisfactory to the defendant, and they were not bound to rely upon the outcome of some deal the defendant made without their approval." If the Iowa court had held that the commission was not due until the company had exercised its option and given it to the selling agent, they certainly would not have used the language above quoted.

To recapitulate, it is my opinion that the contract provides generally for a 10 per cent cash commission, whether the purchase price was represented partly by secondhand goods or not. In case the company so elected, the agent must take his commission out of the secondhand machinery. The company, however, was under no obligations to exercise this option, and in such case the agent would automatically be entitled to cash. If this construction is correct, we have to determine whether under the facts in this case the company exercised this option. Upon this phase of the question, I have only to say that the matter was properly for the jury, who, under direction of the court, found that the company had not exercised the same. This phase of the question, however, I do not deem of much importance. I must respectfully but most earnestly dissent.

On Petition for Rehearing Filed July 2, 1915.

BRUCE, J.   A petition for rehearing has been filed in this case, which calls to our attention the fact that in stating the evidence we used the word "allow," instead of "pay," and that the contract actually read, "No commissions shall be paid for sales made when other goods or property are taken in part payment."   We do not see, however, how this fact can alter the inevitable conclusion which must be arrived at in this case.   As we before stated, it is the written contract alone that is sued upon, and the suit is brought for the 10 per cent commission provided for in that contract.   There is no proof of a contract for any other commission.   This commission, it is expressly stated, cannot be recovered unless the agent guarantees the sale of the second-hand machinery which is taken in trade.   This the defendant (the agent) has positively refused to do.   How, therefore, he can recover 10 per cent commission upon the written contract is difficult for us to see. It is idle to say that there was a waiver.   In our view of the case no such waiver is proved, and certainly no such waiver is *pleaded*.   That a waiver and estoppel must be specially pleaded in order to be relied upon has been so often and so recently held by this court, and is so well established as a general principle of law, that no argument upon the proposition is necessary.

It is urged, we know, that the plaintiff is a threshing machine company, but we have yet to learn that there is one law of contracts and of pleading and practice for threshing machine companies, and another for other persons.   The law, as we understand it, is no respecter of persons.   It is also urged that the proof shows that the sale was actually consummated at the farm of the purchaser, and not at the office of the plaintiff company.   This fact we consider to be immaterial, as the suit is brought upon the written contract, and upon the written contract alone, and for the commission provided for in that contract. It is also urged that the evidence shows that the purchaser had agreed with the defendant agent to purchase for cash, and before the visit to the company had consummated the sale.   We find, however, no such proof in the record.   All that the defendant testified to is that:   "I went out to Oelke's and told him I had the agency for the Case Threshing Machine Company and asked him if I could sell him a

rig, as I understood he was in the market for a rig; but he said he did not know but what I could sometime, but at that time I couldn't do business with him. Well, of course, that didn't discourage me, and I went back again several other times. About a year later than that, —some time later than that, I don't know exactly the time,—I went out there again and talked to him, and he says, 'I will tell you, Loomis, I am going to buy a rig; and if the rig you represent, that is, the Case rig, is what you say it is, I will buy it. You need not come out again bothering me, because I am busy, but if your rig is as you represent it to be I will buy it. So there is no use bothering me any more, because,' he says, 'you and I have done lots of business together.' "

If this evidence shows a consummated sale or enforceable agreement to purchase for cash or secured notes and at the terms provided for in the agent's contract, then no person is safe in talking with any selling agent. It is needless to say that it lacks all of the essentials of a valid contract.

The petition for a rehearing is denied.

Goss, J., and Burke, J., renew their dissents.